UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **COURTNEY A. JARELL,**<br>      Plaintiff, | Case No. 3:13 CV 1668 |
| v. | Magistrate Judge James R. Knepp II |
| **COMMISSIONER OF SOCIAL SECURITY,**<br>      Defendant. | MEMORANDUM OPINION AND ORDER |

### INTRODUCTION

Plaintiff Courtney Jarell seeks judicial review of the Commissioner's denial of disability insurance benefits (DIB) and supplemental security income (SSI) under 42 U.S.C. § 1383. The district court has jurisdiction over this case under 42 U.S.C. §138(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on July 8, 2011 and July 14, 2011, respectively. (Tr. 11, 173, 175). Her claims were denied initially and on reconsideration. (Tr. 116, 120, 127, 134). Plaintiff then filed a written request for a hearing before an Administrative Law Judge (ALJ). (Tr. 141). At the hearing, Plaintiff (represented by counsel) and a vocational expert (VE) testified. (Tr. 31). On June 28, 2012, the ALJ concluded Plaintiff was not disabled. (Tr. 19). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On June 24, 2012, Plaintiff filed the instant case. (Doc. 1).

# FACTUAL BACKGROUND

***Plaintiff's Personal and Vocational History***

Plaintiff was born on June 16, 1988; she was 23 years old at the time of the ALJ hearing. (Tr. 17, 34). Plaintiff has a high school education and completed a dental assistant program. (Tr. 17, 197). According to Plaintiff's work history report, she worked as a dental assistant at three different dental offices spanning from October 2007 until June 2010. (Tr. 203). Prior to working in the dental field, Plaintiff worked as a gas station cashier, a screen printer, and a grocery store bagger. (Tr. 212).

Concerning activities of daily living, Plaintiff testified that she made breakfast and got her daughter dressed for school. (Tr. 36-37). She cooked, performed household chores, and shopped with help from her father and also testified she was taking classes online. (Tr. 36-37, 41). Indeed, Plaintiff was enrolled for eight college credit hours including anatomy, physiology, and psychology and was able to drive, although panic attacks and forced her to pull over from time to time. (Tr. 14, 41-42).

She reported shoulder pain since the age of fourteen or fifteen that was caused by scoliosis; however, a motor vehicle accident "a few years ago" resulted in upper and lower back pain as well as "shooting pain" in her neck. (Tr. 74). Plaintiff said she could not "stand for longer than 30 minutes before her lower back and legs start[ed] to hurt" and she could not lift her left arm over her head. (Tr. 74). According to Plaintiff, the pain was manageable and it was her "mental issues", not her physical condition, which caused her to quit working. (Tr. 74). Although she had no income, Plaintiff averred she was capable of managing her own money. (Tr. 74).

Plaintiff claimed her depression worsened since she gave birth to her four-year-old daughter. (Tr. 74). She stated that she stayed in bed and cried for nearly half of every week. (Tr.

74). She also stated bipolar disorder was only recently discovered and her mood was unpredictable, ranging from "talkative" on some days to "really quiet" on others. (Tr. 74).

Plaintiff claims her anxiety is of unknown origin and previously caused her to check into the emergency room for fear her heart was going to stop. (Tr. 74). Plaintiff averred large groups of people caused paranoia and public panic attacks. (Tr. 74).

***Medical History***

Theophilus Arthur-Mensah, M.D.

During a November 10, 2010 office visit, Plaintiff complained of panic attacks, described feeling like she was having a heart attack, and reported trouble falling asleep. (Tr. 258, 448). Felicia Fior-Nossek, MSN, APRN-BC, performed an evaluation for Theophilus Arthur-Mensah, M.D., and noted a history of bulimia, depression, and ephedrine addiction. (Tr. 258, 448). Throughout the mental status exam, the only notable observation was Plaintiff's "anxious" mood and anxiousness around people. (Tr. 449-50). Dr. Arthur-Mensah diagnosed panic disorder (without agoraphobia and history of bulimia), and anxiety, and assigned a global assessment of functioning (GAF) score of 48.[1] (Tr. 450-51).

At a subsequent office visit, on March 3, 2011, Plaintiff reported that "overall anxiety improved" with Paxil. (Tr. 262, 444). Plaintiff mentioned the recent anniversary of her brother's death, which made her sad, and said she was experiencing financial- and school-related stress. (Tr. 262, 444). She also stated "often at times, little things make me sad." (Tr. 262, 444). However, Plaintiff reported she was "keeping busy", "no longer scared to go places", "unanxious

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *Id.*, at 34.

in class", and "tolerating medications". (Tr. 262, 444). Dr. Arthur-Mensah increased prescribed dosages of Paxil and Klonopin. (Tr. 262, 444).

Liwanag A. Asuncion, M.D.

Liwanag A. Asuncion, M.D., began treating Plaintiff on September 21, 2006. (Tr. 426). Dr. Asuncion conducted an initial physical examination, noting Plaintiff's pertinent medical and personal history. (Tr. 426). Roughly one year later, Dr. Asuncion noted acute bronchitis but the appointment was otherwise unremarkable. (Tr. 424). Their next meeting would not be for another three years, when on October 27, 2010, Plaintiff was again diagnosed with acute bronchitis and Dr. Asuncion acknowledged Plaintiff's hospital visit for anxiety and depression. (Tr. 421, 424). On December 20, 2010, Plaintiff was "somewhat anxious" and was being seen by Dr. Arthur-Mensah, a psychotherapist. (Tr. 421).

However, on February 24, 2011, May 11, 2011, and April 2, 2012, treatment notes yielded nothing remarkable but for lower abdomen pain, sinus drainage, and a sore throat. (Tr. 419, 421). On April 17, 2012, Dr. Asuncion did note "some chronic depression." (Tr. 419).

Ross Lubriani, M.D.

On August 2, 2010, Plaintiff began treatment with chiropractor Ross Lubriani, M.D., for injuries she sustained in an automobile accident. (Tr. 249, 251). Following the accident, x-rays of Plaintiff's cervical, thoracic, and lumbar spine were normal. (Tr. 254-56).

During an August 3, 2010 visit, Plaintiff reported no change in the severity of her lumbar pain, headaches, neck pain, or thoracic pain. (Tr. 251). No notable progress was observed. (Tr. 251). The following day, Plaintiff reported an increase in headache frequency but Dr. Lubriani noted Plaintiff had made "7% improvement since her prior treatment . . . is responding favorably to her treatment thus far and has shown a reduction in the intensity of her condition." (Tr. 251).

On August 6, 2010, Plaintiff again reported an increase in headache frequency but Dr. Lubriani reported Plaintiff was "responding favorably with a reduction in her overall symptoms." (Tr. 251). During an appointment on August 11, 2010, Plaintiff reported her lumbar pain had "improved noticeably" and her sleep had also improved "for the first time since the accident." (Tr. 252). During this appointment, Dr. Lubriani noted that Plaintiff showed an "approximately 8% improvement since her previous visit", "[t]reatment thus far has proved to be positive", and she was "responding positively with a reduction in her overall symptoms." (Tr. 252).

The next day, Plaintiff reported increased lumbar and headache pain. (Tr. 252). Dr. Lubriani described pain and tenderness as moderate and the severity and frequency of Plaintiff's condition was unchanged from the previous visit. (Tr. 252). On August 17, 2010, Plaintiff reported her lumbar pain was unchanged, however she reported a decrease in her headache frequency "from constant to frequent". (Tr. 253). Dr. Lubriani noted an overall improvement of 2% since Plaintiff's previous visit. (Tr. 253).

The final appointment on record with Dr. Lubriani was August 18, 2010. (Tr. 253). Plaintiff reported her lumbar pain had improved and her headache frequency was unchanged. (Tr. 253). Dr. Lubriani noted Plaintiff showed "approximately a 14% improvement since her prior treatment" and the current treatment plain ha[d] reduced the severity of her condition. (Tr. 253).

Barat Shah, M.D.

Upon referral by Dr. Asuncion, Plaintiff met with Dr. Shah on January 24, 2011. (Tr. 264). Plaintiff complained of pain in her cervical spine and in her lower back and reported a family history of arthritis, asthma, diabetes, depression, headaches, heart attacks, high blood pressure, hip pain, lower back pain, migraine, and neck pain. (Tr. 264). Plaintiff appeared

"awake, alert, and oriented"; Dr. Shah noted "facet tenderness bilaterally over L3-L4, L4-L5, and L5-S1"; Plaintiff's cervical facets were tender bilaterally"; and Plaintiff had a good range of motion in her lumbar spine. (Tr. 264, 266-68)

Dr. Shah also conducted a neurological examination. Upon measuring Plaintiff's deep tendon reflexes on a scale from 0 to +4 with +2 being normal, Dr. Shah attributed a "+1" rating to Plaintiff's biceps, triceps, brachioradialis, Achilles, hamstrings, and patellar. (Tr. 267). Motor systems were reportedly intact, no gross defects were observed, and "all dermatomes [were] normal to light touch and pinprick" throughout the sensory examination. (Tr. 267).

A muscle evaluation was normal and Plaintiff was diagnosed with cervical spine pain, myofascitis, and lumbar spine pain. (Tr. 267). X-rays of cervical and lumbar spine appeared "unremarkable" and Dr. Shah recommended a trigger point injection but until then, prescribed Ultram and Zanaflex, and recommended Plaintiff continue taking Ibuprofen. (Tr. 268).

Plaintiff returned on February 23, 2011 for a trigger point injection and reported no change in the degree of neck pain. (Tr. 269). Plaintiff claimed the Ultram was not working, so Dr. Shah increased the dose and recommended continued use of Ibuprofen and Zanaflex. (Tr. 272).

On March 29, 2011, Plaintiff reported a "definite reduction" in neck pain severity. (Tr. 272). Dr. Shah recommended Plaintiff discontinue Ibuprofen, begin Norco and Voltaren, continue Zanaflex, and increase Ultram. (Tr. 276). Dr. Shah noted Plaintiff was still experiencing pain in her arm, neck, and back, which was exacerbated by a recent fall on the ice. (Tr. 276). Because the trigger point injection did not work, Dr. Shah prescribed a small dose of narcotics, although he advised it was not a long term solution. (Tr. 276).

On April 27, 2011, Plaintiff returned complaining of increased cervical pain. (Tr. 277). On June 22, 2011, Plaintiff noted a slight improvement in cervical pain but no significant improvement in lumbar pain. (Tr. 281). Plaintiff rated her neck pain at a five and lower back pain at a six on scale of ten. (Tr. 281). MRIs of Plaintiff's lumbar and cervical spine were normal and Dr. Shah recommended Plaintiff begin aqua therapy and continue taking Norco, Zanaflex, and Voltaren. (Tr. 285, 298-99).

The following month, Plaintiff reported a general worsening of her neck pain but a slight improvement in lower back pain. (Tr. 285). Asked again to rate the pain on a scale of one to ten, Plaintiff rated her neck pain at a seven and her lower back pain at a five. (Tr. 285). Dr. Shah recommended Plaintiff continue her medication regimen and begin aqua therapy. (Tr. 288). On September 23, 2011, Plaintiff rated her neck and lower back pain at an eight and six, respectively. (Tr. 289). Dr. Shah diagnosed fibromyalgia, prescribed Lyrica, and ordered a detailed musculoskeletal re-evaluation to be performed that day. (Tr. 292-93).

During an office visit on October 19, 2011, using the same pain scale, Plaintiff reported the pain of both lumbar and cervical spine at five. (Tr. 293). She said the pain had improved since taking Lyrica, resulting in less lethargy and feeling better overall. (Tr. 297). Plaintiff's medication regimen was adjusted. (Tr. 297).

On March 26, 2012, Plaintiff reported a slight improvement in her neck pain but a marked increase in lumbar pain. (Tr. 433). Pain was reported at a level six and eight, respectively. (Tr. 433). Dr. Shah recommended discontinuing Zanaflex and increasing the dose of Norco. (Tr. 437). According to Dr. Shah, Plaintiff "[h]as fibromyalgia," and "was tearful in office due to the pain and being so young." (Tr. 437).

7

On April 6, 2012, Dr. Shah prepared a physical residual functional capacity (RFC) assessment and noted diagnoses of cervical spine pain, myofascitis, and lumbar spine pain. (Tr. 428). Dr. Shah also noted Plaintiff's lumbar MRI and cervical spine MRI were both normal and her impairments had not lasted (and were not expected to last) at least twelve months. (Tr. 429). Dr. Shah reported Plaintiff was capable of low stress jobs, could frequently lift ten pounds or less, and could occasionally lift up to twenty pounds. (Tr. 431).

However, Dr. Shah noted Plaintiff's pain constantly interfered with her attention and concentration. (Tr. 429). Moreover, he noted Plaintiff was limited to sitting, standing, or walking for two hours in an eight-hour workday and would have to take unscheduled beaks about every thirty minutes each lasting between ten and fifteen minutes. (Tr. 430-31).

On April 25, 2012, Plaintiff reported her pain was less severe overall, rating neck and lower back pain at four and six respectively. (Tr. 438).

Byong Ahn, M.D.

During their first appointment on July 7, 2011, Dr. Ahn reported Plaintiff was suffering from possible major depression and ruled out bipolar affective disorder after observing moderate insight and fair judgment. (Tr. 364). Plaintiff also admitted having mood swings. (Tr. 365). Dr. Ahn assigned a current GAF score of 45[2] but added she attained a GAF score of 65[3] over the last year. (Tr. 366).

On April 17, 2012, Dr. Ahn prepared an RFC assessment and concluded Plaintiff's mental impairments moderately affected her ability to make judgments concerning simple work-

---

2. *DSM-IV-TR*, *supra* note 1.
3. A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning, (e.g., occasional truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*.

related decisions and activities of daily living. (Tr. 411-13). Dr. Ahn reported that Plaintiff displayed marked impairments in her ability to understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the public, interact appropriately with supervisor(s), interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. (Tr. 413). Further, Dr. Ahn assigned a current GAF score of 55[4] and noted her highest GAF score in the past year was 68.[5] (Tr. 413).

Dr. Ahn noted "increased stress (life-work) exacerbated her anxiety causing an increase in irritability and inability to maintain focus and concentration". (Tr. 413). Dr. Ahn added, "[m]ood swings increase – fluctuate between anger and sadness – cannot tolerate social settings – has punched holes in wall. Yells". (Tr. 411-13).

Regarding his more severe findings, Dr. Ahn determined Plaintiff's "difficulties in maintaining social functioning" was extreme and she was constantly impaired through deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner as well as episodes of deterioration or decompensation in work or work-like setting which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behavior). (Tr. 411-13).

### State Agency Medical Assessments

On August 21, 2011, William Bolz, M.D., reviewed medical evidence and completed a physical RFC assessment. (Tr. 65, 78). Dr. Bolz found Plaintiff could occasionally lift and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds; sit, stand, and/or

---

4. A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers).
5. *DSM-IV-TR*, *supra* note 3.

walk for a total of about six hours in an eight-hour workday with normal breaks; and push and/or pull without limitation. (Tr. 65, 78-79). Plaintiff could frequently stoop and crawl and had an unlimited ability to crouch, kneel, balance, and climb ramps, stairs, ladders, ropes, and scaffolds. (Tr. 66, 79). Dr. Bolz found no manipulative visual, communicative, or environmental limitations. (Tr. 66, 79).

Dr. Bolz found Plaintiff's impairments did not preclude her from completing her activities of daily living. (Tr. 83). Moreover, he reported Plaintiff had normal use of her arms and legs, and she could perform "light duty work tasks that d[id] not require strict production quotas." (Tr. 69, 83).

Upon reconsideration of these findings, Diane Manos, M.D., reached the same conclusions as Dr. Bolz. (Tr. 94-95, 108-09). Additionally, according to Dr. Manos, "[t]he updated medical evidence shows that [Plaintiff] report[ed] an improvement in her back/neck pain . . . and retain[ed] good [range of motion] and strength." (Tr. 95, 109).

On August 17, 2011, Karla Voyten, Ph.D., prepared a mental RFC assessment and found no limitations in Plaintiff's ability to carry out very short and simple instructions. (Tr. 67, 80). Dr. Voyten reported Plaintiff "experiences chronic depressive symptoms and intermittent anxiety symptoms", noted treatment had improved her symptoms, and concluded she could work in environments where duties did not change frequently. (Tr. 67, 80). Dr. Voyten noted Plaintiff was capable of superficial interactions with those around her. (Tr. 68, 81). Plaintiff was also capable of repetitive work tasks not requiring production quotas and which were static. (Tr. 68, 81).

Vicki Warren, Ph.D., reviewed the record and reported, "the medical evidence shows that the claimant reports improvement in her symptoms", "a reduction in the intensity/frequency of

her anxiety, and is able to do her own shopping, cleaning, and laundry." (Tr. 97, 111). Therefore, Dr. Warren affirmed Dr. Voyten's assessment as written. (Tr. 97, 111).

***ALJ Decision***

The ALJ found Plaintiff had severe impairments including fibromyalgia, mood disorder, and anxiety disorder. (Tr. 13). However, none of these impairments met or equaled the severity of a listed impairment. (Tr. 14). Next, the ALJ found Plaintiff had the RFC to perform a range of light work with additional exertional and nonexertional limitations. (Tr. 15). Based on Plaintiff's age, education, work experience, RFC, and VE testimony, the ALJ concluded Plaintiff could find work as an office cleaner, mail clerk, or cafeteria attendant, and therefore, was not disabled. (Tr. 18).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can she perform past relevant work?

5. Can the claimant do any other work considering her RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps on through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f); 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff argues the ALJ erred by violating the treating physician rule with respect to the opinions of Drs. Shah and Ahn and the state agency medical experts. Therefore, claims Plaintiff, the ALJ's decision is not supported by substantial evidence. (Doc. 13).

***Treating Physician Rule***

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 242 (6th Cir. 2007); *see also* Social Security Ruling (SSR) 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id*. The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id*. A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243. Accordingly, failure to give good reasons requires remand. *Id.*

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the

13

record as a whole. *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. §§ 404.1502; 416.902. A medical provider is *not* considered a treating source if the claimant's relationship with him or her is based solely on the claimant's need to obtain a report in support of their claim for disability. §§ 404.1502; 416.902 (emphasis added). Non-treating sources are physicians, psychologists, or other acceptable medical sources who have examined the claimant but do not have, or did not have, an ongoing treatment relationship with them. §§404.1502; 416.902. This includes a consultative examiner. §§404.1502; 416.902

Last in the medical source hierarchy are non-examining sources. These are physicians, psychologists, or other acceptable medical sources who have not examined the claimant, but review medical evidence and provide an opinion. §§ 404.1502; 416.902. This includes state agency physicians and psychologists. §§ 404.1502; 416.902. The ALJ "must consider findings and other opinions of [s]tate agency medical and psychological consultants … as opinion evidence", except for the ultimate determination about whether the individual is disabled. §§ 404.1527(e)(2)(ii); 416.927.

14

***Dr. Shah***

First, Plaintiff claims the ALJ "failed to accord appropriate weight to Dr. Shah's opinion and his reasons for rejecting the opinion [were] not supported by substantial evidence." (Doc. 15, at 14).

Here, the ALJ gave some weight to Dr. Shah's April 6, 2012 opinion and found his lifting and low stress restrictions supported by the objective evidence in the record. (Tr. 17). However, the ALJ afforded less than controlling weight to Dr. Shah's opinion restricting Plaintiff's ability to sit and walk, requiring unscheduled breaks, and predicting constant interference with concentration due to pain, because those findings were not supported by the objective evidence in the record. (Tr. 17). In other words, consistent with his regulatory obligation, the ALJ declined to afford controlling weight to those parts of Dr. Shah's opinion which were not consistent with objective evidence of record. 20 C.F.R. § 404.1527. Where a treating physician's opinion is inconsistent with other substantial medical evidence, this is a "good reason" for refusing to award controlling weight. *Wilson,* 378 F.3d at 544; *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (an ALJ's reasons for discounting a treating physician may be brief).

Plaintiff argues the ALJ failed to consider each regulatory factor set forth by 20 C.F.R. § 404.1527, including consistency with objective evidence in the record, Plaintiff's treating relationship with Dr. Shah, and Dr. Shah's treatment specialty. (Doc. 15, at 12-13). However, the ALJ is under no such obligation. *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804-05 (6th Cir. 2011) (finding the good reasons requirement does not require an "exhaustive factor-by-by factor analysis"). An ALJ is required to only *consider* the relevant factors and provide good reasons for the weight he assigns. *Francis*, 414 F. App'x at 804-05; *see also*, *Rogers*, 486 F.3d

234, 242 ("in determining how much weight is appropriate, [the ALJ] must *consider* a host of factors") (emphasis added).

Following careful review, the Court finds the ALJ supported his decision with substantial evidence. Indeed, as the ALJ stated, x-rays of Plaintiff's lumbar, thoracic, and cervical spine taken at the time of the accident were normal. (Tr. 16, *referring to*, Tr. 254-56). The ALJ also cited to MRIs of Plaintiff's lumbar and cervical spine taken shortly after her accident, which revealed no abnormalities. (Tr. 16, *referring to*, Tr. 408-09). Further, as the ALJ points out, Dr. Shah's own treatment notes during his initial visit with Plaintiff revealed "good range of motion and normal sensation" in spite of "facet tenderness over L3-L4, L4-L5, and L5-S1 and reflexes at 1+". (Tr. 16, *referring to*, Tr. 267). The ALJ also pointed out that Dr. Shaw generally described Plaintiff's pain as mild to moderate. (Tr. 16, *referring to*, Tr. 270, 273-74). Moreover, Plaintiff's treating physician, Dr. Asuncion, noted only muscle spasms in Plaintiff's left scapula. (Tr. 16, *referring to*, Tr. 426). Generally, Plaintiff complained of unrelated physical conditions during her visits to Dr. Asuncion, including strep throat and bronchitis. (Tr. 416-26). Furthermore, the ALJ considered Plaintiff's prescriptions for Ultram, Zanaflex, Ibuprofen, Voltaren, and Lyrica, which was a relatively conservative treatment regimen that did not indicate the type of intense limitations outlined in the physical RFC assessment completed by Dr. Shah. (Tr. 16, *referring to*, Tr. 266, 268, 271-72, 275-76, 280-81, 284-85, 288, 292, 296).

Additionally, as the ALJ discussed, the Plaintiff's own testimony regarding her activities of daily living does not support Dr. Shah's limitations regarding her ability to sit, stand, and walk during a normal workday, nor does it support his finding that her pain constantly interfered with her attention and concentration. (Tr. 14, 17). Rather, Plaintiff said, she got her daughter ready for

school, cooked, performed household chores, shopped with assistance from her father, took online classes, and drove a car. (Tr. 14, *referring to*, Tr. 36-37, 40-41, 50-52).

Last, Plaintiff's arguments that the ALJ did not discuss certain pieces of evidence or misconstrued Dr. Shah's treatment notes (Doc. 15, at 13-14) are not well taken for two reasons. First, the ALJ is under no obligation to discuss each piece of evidence from the record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each . . . opinion, it is well settled that 'an ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.'") (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Second, the Court must affirm the Commissioner's decision even where there is substantial evidence to support an alternative finding. *Jones*, 336 F.3d at 475.

In sum, the ALJ provided good reasons for affording weight only to those parts of Dr. Shah's opinion which were consistent with the objective evidence in the record, and his decision is supported by substantial evidence. 20 C.F.R. § 404.1527.

**Dr. Ahn**

Next, Plaintiff argues, "[i]n determining the weight to be given to Dr. Ahn's report, none of the factors set forth in 20 C.F.R. § 404.1527 were discussed by the ALJ." (Doc. 15, at 14). However, in his decision, the ALJ gave little weight to the mental RFC assessment completed by Dr. Ahn because it was "inconsistent with the objective medical evidence in the record including Dr. Ahn's own treatment notes and his finding that she currently has a GAF of 55 which suggests moderate limitations and has had a GAF of 68 in the past year which suggests mild limitations". (Tr. 17). Consistent with his regulatory obligations, the ALJ considered objective evidence of record and the supportability of Dr. Ahn's opinion as part of his decision to afford little weight to

the restrictive opinion. 20 C.F.R. § 404.1527. Further, as explained below, the ALJ supported his decision with substantial evidence.

Objectively, the ALJ pointed to recent treatment notes which demonstrated improvement in mental functioning. (Tr. 16). To this end, the ALJ noted Dr. Fior-Nossek assigned a GAF of 48 on November 10, 2010, however, in 2012, Dr. Ahn assigned a GAF of 55 and noted her highest GAF over the past year was 68. (Tr. 16, *referring to*, Tr. 258-61, 411-13). Moreover, on October 25, 2011, Plaintiff reported improvement during an office visit with Dr. Ahn. (Tr. 17, *referring to*, Tr. 415). There, Dr. Ahn noted Plaintiff "reported that she has been doing better . . . [h]er mood swings are much better . . . she is on an even keel . . . [and she] still has some anxiety and panic-like symptoms, but the intensity and frequency have diminished". (*Id*.). These observations do not support Dr. Ahn's RFC assessment indicating Plaintiff has "marked, extreme, constant, and continual limitations in her ability to perform work-related mental activities". (Tr. 17, *referring to*, Tr. 411-13).

The ALJ also paid consideration to Dr. Ahn's conservative medication management plan of Zonegram, Lexapro, and Xanax, which further unsubstantiated the findings in his RFC opinion. (Tr. 16, *referring to*, Tr. 361-66). Further, as described above, the ALJ commented on Plaintiff's mild restriction in activities of daily living (Tr. 14, *referring to*, Tr. 31-57), which did not support Dr. Ahn's RFC assessment connoting much more intense restrictions on her mental abilities. The ALJ also remarked on Plaintiff's less-than-marked limitations in social functioning; concentration, persistence, or pace; and episodes of decompensation, finding they did not support Dr. Ahn's unduly restrictive RFC assessment. (Tr. 14-15). To this end, the ALJ noted Plaintiff was able to spend time with her family on a daily basis, although she could not shop by herself,

suffered from panic attacks and anxiety, and had some difficulty maintaining focus and concentration. (Tr. 14, *referring to*, Tr. 31-57).

Next, the ALJ held Dr. Ahn's findings were internally unsupported by Dr. Ahn's own assessment that Plaintiff had a current GAF score of 55 and had a past year GAF of 68, indicating mild to moderate limitations. (Tr. 17, *referring to*, Tr. 411-13).

Plaintiff argues the ALJ improperly relied on GAF scores because a GAF score is not dispositive "in and of itself". (Doc. 12, at 13). However, the ALJ did not use GAF scores strictly to determine whether or not Plaintiff was disabled; rather, the ALJ used Dr. Ahn's GAF scores to correctly show they conflicted with Dr. Ahn's assessment of Plaintiff's functional limitations and also showed improvement. (Tr. 17); *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011) (the Sixth Circuit views GAF scores as "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning"). Indeed, Dr. Ahn assigned Plaintiff GAF scores indicating only mild to moderate symptom severity, but otherwise concluded Plaintiff "experienced marked, extreme, constant, and continual limitations in her ability to perform work related mental activities". (Tr. 17); *Oliver*, 415 F. App'x at 684. Therefore, the ALJ did not err by using Dr. Ahn's assignment of GAF scores – which represented his judgment of Plaintiff's functioning – to contradict Dr. Ahn's more restrictive assessment finding Plaintiff markedly limited and disabled.

For the above stated reasons, the ALJ complied with his regulatory obligations by commenting on the supportability and consistency of Dr. Ahn's opinion and his decision is supported by substantial evidence.

### Findings of the State Agency Physicians

Last, Plaintiff argues the ALJ did not provide good reasons for giving state agency reviewers significant weight.

"[T]he opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813, 823-24 (S.D. Ohio 2011). This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; 20 C.F.R. § 416.927(d), (f); SSR 96–6p at *2–3. "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F. Supp. 2d at 823-24.

Here, the ALJ gave significant weight to the state agency reviewing physicians because their opinions were well supported by the case record. (Tr. 17). This statement, in and of itself, is not error requiring reversal. *See, Pence v. Comm'r of Soc. Security*, 2014 U.S. Dist. LEXIS 37841, at *31-34 (N.D. Ohio) ("Granting greater weight to the state agency doctors' opinions is not, on its own, error mandating reversal") (citing SSR 96-6p). Further, as explained above, the ALJ provided good reasons for affording the opinions of Drs. Ahn and Shah less than controlling weight because of inconsistencies with the objective evidence in the record and supportability issues. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (an ALJ may afford weight to a nonexamining or nontreating source "but only if a treating-source opinion is not deemed controlling."). Moreover, the ALJ supported his decision with substantial evidence, including reference to Plaintiff's testimony concerning activities of daily living, her conservative

treatment regimen, minimal objective findings, and documented improvement in mental symptoms. (Tr. 15-16). Accordingly, Plaintiff's arguments regarding the ALJ's treatment of the state agency physicians' opinions are not well-taken.

**CONCLUSION**

Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision denying SSI and DIB supported by substantial evidence. Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

s/James R. Knepp II
United States Magistrate Judge
